# Commonwealth, ex rel. John F. Connolly, District Attorney, Plff. in Err., *v.* Frank N. Halstead.

The first five sections of the act of March 18, 1875, are unconstitutional, under article III, § 3, of the Constitution.

(Decided October 4, 1886.)

Error to the Common Pleas of Lackawanna County to review a judgment for defendant in an action of quo warranto. Reversed.

Reported below in 1 Pa. Co. Ct. 335.

The facts are stated in the opinion of the court below, as follows:

HAND, P. J.:

This is the case of a writ of quo warranto issued to test the title of Frank N. Halstead to the office of assessor of the sixteenth ward of the city of Scranton, a city of the third class. The information alleges that since the second day of April, 1883, the defendant has intruded into the office of assessor of taxes of the sixteenth ward of Scranton, without having been legally elected and appointed thereto; that Nathaniel Halstead was duly elected and appointed to the said office on the 20th day of February, A. D. 1883.

The answer of the defendant alleges that he was duly and legally appointed assessor to assess property for city purposes only, under the statute in such cases made and provided, to wit, act of March 18, 1875 (P. L. 15), which said statute was duly accepted and adopted by the city councils of the city of Scranton, by an ordinance duly passed by a majority of the members elected to each branch thereof voting in favor of the same, and approved by the mayor upon the 16th day of March, 1877, be-

NOTE.—This case raised the same questions as, and is ruled by, Scranton School Dist.'s Appeal, 113 Pa. 176, 4 Cent. Rep. 311, 6 Atl. 158.

ing appointed assessor as aforesaid, by the judges of the court
of common pleas of said county, on the 20th of March, A. D.
1884; which office he accepted and has exercised and continues
to exercise.

To the plea and answer the plaintiff joins issue in the nature
of a demurrer, admitting the facts and alleging that they are
not sufficient in law, because the act of assembly of March 18,
A. D. 1875 (P. L. 15), is unconstitutional and in violation of
the provisions of the Constitution of the commonwealth of Penn-
sylvania.

The issue is joined on this sole question of the constitutional-
ity of the act of March 18, 1875, a supplement to the act of
1874, dividing cities into three classes.

The clauses of the Constitution which it is claimed are vio-
lated by the act of 1875 are:

Art. III. § 6, relating to amendments.

Art. IX. § 1, relating to uniformity of taxation.

Art. III. sections relating to local and special legislation, as
specified under that article.

We can only briefly state our views in regard to the questions
raised, and must base them rather upon general and recognized
principles of constitutional law than upon the analogy of par-
ticular cases found among the decisions of our higher courts.
While the demurrer places this issue upon the unconstitutional-
ity of the whole act of assembly, it would be only necessary to in-
quire as to the validity of the appointment of assessors by the
court, upon the application of the councils, as provided for in the
first section of the act of 1875.

Under article XII. § 1, we have no doubt of the power of the
legislature to vest, in their wisdom, the appointing of the assess-
ors of cities for taxation for city purposes in the judges of the
courts of common pleas.   We remark in this connection, to be
further dwelt upon, that the act of 1875 applies to all cities of
the third class to the same extent that the act of 1874 does, and
specifically to all cities of the third class, subject only to their ac-
ceptance.

The objection which seeks to break down the whole of the act
of 1875 (that it violates § 6, art. III. of the Constitution, in that

it is amendatory of the act of 1874 and, therefore, improperly drawn, because the act of 1874 is not re-enacted and published at length) is not well taken.   Simply because a law, properly expressed by title as a supplement to an act, the title of which is fully set forth, by construction is incidentally amendatory of the previous act, or even necessarily so when germane to the whole subject-matter, is therefore within the provisions of the 6th section, article III. would be a construction which would create a greater evil than that section was sought to remedy.   All supplements are more or less amendatory.   It was never intended that, because an act had this character, it must necessarily include all verbiage of previous legislation within its language. The object of the section was to give a clear idea to legislators and citizens of what was intended as law; and to prevent the covering up of a design by reference to title only.

We come next to the question:   Is the act of 1875 prohibited special legislation?

It is argued that it is an attempt to subclassify cities so as to reach forbidden legislation by indirection.   The allegation is that the proviso of the 5th section works this apprehended evil, in that it makes three classes of cities, *viz.:* those which adopt the act, those which do not, and those which are chartered subsequently.   It is erroneous to call it three classes; it is only two, those which are under the act and those which are not.   If this be an evil, it is one which can hardly be avoided by legislation or Constitution, except in a new territory, not blessed with years of civilization.

It is urged that because a city, by its constituted authorities, has the option to accept the amendment to its charter, the vice is allowed to come in.   We apprehend, however, that this conclusion is neither logical, honorable to the present Constitution, nor wise, in view of the history which precedes this legislation.   A few plain general statements will show this.   The right of cities to their charters and their specific vested rights has always been held by laws and constitutions to be sacred.   Some of the severest struggles in history have been prolonged to secure this right. Our present Constitution in many ways recognizes this, even in the case of private corporations.   A careful effort to avoid in-

terference with acquired rights is apparent. When the Constitution of 1874 was adopted there was an effort, it is true, to create uniformity and generality of legislation, and to sweep away, so far as possible, the evils of special legislation. In so far as this was to affect the future of the cities not then in being, it was no doubt wise; it may be also wise that it should, as far as possible, tend to make uniform the charters then in existence; but that it was wise or intended to strip from the cities, without their consent, valued rights, or to impose upon them even benefits, which the legislature deemed such, without their consent, is not to be considered.

The city of Scranton with others came into existence under a granted charter many years before the present Constitution and the legislation thereunder. Very wisely did the framers of the act of 1874 provide for a preservation of all vested rights, with an invitation to come under the provisions of the act of 1874, in the 57th section of that act. (P. L. 1874, p. 169.)

This section, we apprehend, does more to create uniformity of charters, or fundamental law regulating cities, than any system of forced legislation imposed upon cities could have done. What was the problem presented to the legislature in regard to uniformity of law relating to cities? We are speaking now of full corporations, granted charters and rights, not of mere municipal divisions of territory, as towns and counties. The problem was a class of cities already in existence, with varied charters, special legislation to the full extent, by some considered not an unmixed evil, by the cities themselves considered a legal and vested privilege.

Was it to be supposed that our people were so forgetful of rights secured by law that they would attempt to force the old cities of the commonwealth to dress themselves up in the habiliments of the new era of things? We apprehend that the act of 1874 shows a different view of their duty. They preserved all of the old to which it rightfully belonged, by a provision that "the acceptance shall not be construed to be a repeal or surrender of rights, powers, privileges, and franchises heretofore by law conferred on such city, etc." This was a guaranty to all the old cities against vandalism and wanton disregard of privilege and right.

Then follows the act of 1875, preserving the same jealous care of rights valued by long experience in self-government, and providing for new privileges. Having adopted the principle in the act of 1874, which we have found to be wise and necessary, the same option must be given in the act of 1875, if beyond a peradventure vested chartered rights were not to be interfered with; hence, the condition that it must be accepted by the corporation. By this means it is plain that the tendency is increased toward uniformity of legislation.

The proviso in the act of 1875, applying to cities before incorporated, was an absolute necessity in order to preserve franchises and to further the principle adopted in the act of 1874.

It is to be remarked that the principle which allows a corporation, whose charter is in a sense a contract, to accept of an act of the legislature is very different from that which prohibits the people from voting a law into existence when, under the fundamental law, they have delegated the law-making power to a body of representatives. It has been held in the latter case that such a law is unconstitutional, but we apprehend never in the former case.

The only remaining question is that which relates to art. IX. § 1, regarding uniformity of taxation. It is urged that the division of the rate upon the three classes of property into a full rate, a two-third rate and a half rate, conflicts with this section; also the division of property into the three classes does the same thing. After careful consideration we are unable to discover any wanton exercise of power by the legislature in this behalf. The language of the Constitution is "uniform upon the same class of subjects within the territorial limits of the authority levying the tax."

It will not be urged that the legislature cannot fix the class of subjects. It must do this. The Constitution cannot do it. The legislature has always done it. A reference to the tax laws shows this. Where is the prohibition that has taken this power from the sovereign power of the commonwealth? If it can classify, then it may fix the rate, provided it makes it uniform upon the same class of subjects within the territorial limits of the authority levying the tax, to wit: within the county, the city, the borough, or the township.

But it may be urged that the legislature cannot refine so much upon the classification as to destroy this provision of the fundamental law. This is true. It has been already held that the classification of cities is proper. The classification under the act of 1875 is also proper. It is founded in experience, in natural necessity and in an equal distribution of burdens. We are dealing with incorporated cities, which require special provisions for health, police regulation, safety, and public convenience.

The great source of expense to a city is found in the first classification of real estate; the second source of expense in the second class; and the third source of expense in the third class. The classification is not refined, but natural, scientific, and we might almost say legal; for our courts, without legislation, have recognized the distinction between "rural" property in a city and improved property, where assessment by the front foot is attempted for local improvements. Whether, therefore, we look at it as a question of power or propriety, we reach the same conclusion. We are, therefore, of the opinion that the act of 1875 is not unconstitutional, but within the powers not taken from the legislature.

We have said nothing thus far in regard to the merits of this legislation. If our views are correct, so far as uniformity of taxation is concerned, the act of 1875 is in exact compliance with the letter of the Constitution. It fixes the classes of property and makes the tax uniform on these classes.

It would be useless to try to force city taxation down to the same uniformity as county and township taxation. It never will come to that, from the necessity of the case, the objects to be attained and the values being entirely different.

We look upon the legislation in the acts of 1874 and 1875, relating to cities, as an honest and wise attempt to benefit cities, and to adopt principles in conformity to the Constitution which will actually, in experience, equalize the burdens of taxation. The Constitution, of itself, created two classes of cities, *viz.*, those existing with special privileges and those to come under the general laws for the first time in the history of the commonwealth. There exist only these two classes now.

The acts of 1874 and 1875 have been adopted by cities of the state. The city of Scranton in good faith adopted both at the same time, and for eight years taxes have been assessed under their provisions. They are proved to be beneficial. To declare the act of 1875 now unconstitutional would work confusion, harm and only evil. It cannot be done without the clearest conflict with the letter of the Constitution. If it is in doubt it must stand. The classification is in the power of the legislature; the rated tax is in accordance with the ability of the respective classes to pay, as well as in accordance with the burdens created by them.

If an instance was needed of the beneficial effects of the acts of 1874 and 1875 in the small amount of corporate indebtedness, in the relatively low rate of taxation, and in the acquiescence of those who have the burdens of taxation, the city of Scranton presents that instance. The spirit of our present Constitution is to prevent the increase of both bonded indebtedness and the rate of taxation, and the acts of 1874 and 1875 have tended to and produced this result. In fact the only cry which is heard is that the power does not exist to work out a contrary result, except by a vote of the people as now provided by law. The appointment of assessors has been made by this court on the nomination of councils from year to year, and the only object sought has been judicious officers, who would be capable, so far as possible, of making an equalized assessment. We discover no prohibition which avoids this legislative provision. It gives the people an opportunity to know who is to be appointed, with an opportunity to be heard.

Upon principles which we are constrained to recognize, we cannot set aside the expressed will of the legislature as found in the act of 1875. It has become part of the system regulating cities of the third class, and is not clearly nor by strong implication offensive to the fundamental law.

It is therefore adjudged that the defendant have and retain his office as assessor, and judgment is entered in his favor with costs.

*Horatio N. Patrick* for plaintiff in error.

*I. H. Burns, Joseph O'Brien,* and *Wendell Maclay* for defendant in error.

OPINION BY MR. JUSTICE GREEN:

The respondent in this case claims title to his office by virtue of an appointment as assessor of taxes in the 16th ward of the city of Scranton, made by the court of common pleas of Lackawanna county. The appointment was made under the authority conferred by the first section of the act of March 18, 1875 (P. L. 15).

The question of the validity of the first five sections of that act came before us in the case of Scranton School Dist.'s Appeal, 113 Pa. 176, 4 Cent. Rep. 311, 6 Atl. 158, at the present term. We there held, in an opinion just filed, that those sections of the act were contrary to the provisions of art. 3, § 7, of the Constitution, and therefore void. It follows that the judgment of the court below must be reversed and judgment of ouster entered against the defendant, on the demurrer.

Judgment reversed and judgment of ouster entered against the defendant and that he pay all the costs of the proceeding.